MIDLAND MUTUAL LIFE INSURANCE COMPANY, Appellee,

v.

MERCY CLINICS, INC. f/k/a Mercy Health and Human Services Center, Appellant.

No. 96–1872.

Supreme Court of Iowa.

May 28, 1998.

Steven J. Woolley of Polack, Woolley & Troia, P.C., Omaha, Nebraska, and Michael J. Cunningham of Adams & Howe, P.C., Des Moines, for appellant.

Steven L. Nelson of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellee.

Considered by HARRIS, P.J., CARTER, NEUMAN, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

Both parties seek further review from a court of appeals decision affirming in part and reversing in part the district court's judgment. Midland Mutual Life Insurance Company seeks further review of the decision of the court of appeals to reduce the jury's award of damages. In its application for further review, Mercy Clinics, Inc. seeks further reductions in the amount of damages it owes to Midland, contending the jury's verdict is not supported by substantial evidence. We vacate the decision of the court of appeals as to the issue of damages; reverse the district court judgment in part and remand for entry of judgment.

## I. Background Facts and Procedure

In 1983 West Roads, Ltd. owned a shopping center in Indianola, known as West Roads Shopping Center. On November 14, 1983, Mercy and West Roads entered into a lease agreement for a ten-year term to commence on February 1, 1984 and end on January 31, 1994. At the time the parties signed the lease, they signed two other related agreements. The "finish agreement" required Mercy to make monthly payments to reimburse West Roads for the cost of certain improvements made to the leased premises. The "expansion agreement" required West Roads to construct an addition to the shopping center to provide additional space for Mercy's clinic. The expansion agreement provided that if West Roads did not commence construction on the addition within twenty-four months, it was required to pay the negative cash flow on a building in Indianola owned by Mercy. West Roads did not construct the addition and thus, the terms of the expansion agreement were activated.

In January 1990, Future Development Corporation (FDC) purchased the West Roads Shopping Center from West Roads. To facilitate the purchase, FDC borrowed $1,385,000 from Midland. In connection with the loan, FDC signed a promissory note, a mortgage and security agreement, and an assignment of rents and leases. Under the terms of the assignment, FDC agreed as follows:

(b) [FDC] shall not terminate any Lease (except pursuant to the terms of such Lease upon a default by the tenant thereunder), or grant concessions *or modify or amend any such Lease in any manner whatsoever, without the prior written consent of [Midland]*;

(c) [FDC] *shall not collect any rent more than one (1) month in advance* of the date on which it becomes due under the terms of each Lease.

(Emphasis added.) The assignment also provided that it was an assignment of rights only, and not a delegation of duties. An exhibit attached to the assignment specifically excluded payments under the finish agreement from assignment because those payments were assigned to People's Trust and Savings Bank of Indianola as consideration for the bank's agreement to release its first mortgage on the shopping center property when FDC entered into the loan agreement with Midland. People's had advanced West Roads money to be utilized for tenant improvements at the beginning of the lease and obtained a mortgage to secure repayment of the loan.

On January 18, 1990, Mercy, as a condition of FDC obtaining the loan from Midland, signed an "estoppel certificate" which provided that Midland would not be bound by any prepayment of more than one month's installment of rent or by any other change or modification of the lease without Midland's written consent. The estoppel certificate provided additional security to Midland. Its purpose was to ensure that FDC had a steady flow of resources with which to make monthly payments under the loan agreement. The estoppel certificate also provided:

The undersigned [Mercy] understands that pursuant to the Assignment of the Lease, if there is a default by the Borrower [Future Development] in the performance and observance of the terms of the Mortgage, you [Midland] may, at your option but are not required to, demand that all rents due under the Lease be paid directly to you or your account. Upon notification from you to that effect, the

undersigned will remit any payments due under the Lease to your order. However, until written notification to that effect from you, the undersigned will continue to make Lease payments to borrower as required under the Lease.

During 1991, FDC became delinquent on its loan payments to Midland. This delinquency resulted from the termination of a lease with the shopping center's anchor tenant, a discount department store. Mercy was not aware of this delinquency. In July 1991, Mercy moved its clinic out of the West Roads Shopping Center into a new location in Indianola. Mercy continued to make lease payments to FDC for a period of time. Because Mercy was making lease payments for two different locations, however, it sought to terminate the lease at West Roads.

On May 5, 1992, Mercy and FDC entered into a written lease termination agreement. The agreement provided that Mercy would pay FDC $166,986, representing the present value of all payments owed by Mercy to FDC under the lease (including rent, insurance, taxes and common area maintenance (CAM) charges for the remainder of the term) and finish agreement, with a corresponding reduction for the amounts FDC owed Mercy under the expansion agreement. The terms of the agreement provided that Mercy was to pay $83,493 upon execution of the agreement, make monthly payments of $6,000 from June through October 1992, and render a payment of the remaining balance of $53,493 on November 1, 1992. All payments were made by Mercy as scheduled, beginning with the payment of $83,493 on May 5, 1992. Neither Mercy nor FDC notified Midland of the termination agreement and Midland did not learn of the agreement until March 1993.

Also in May 1992, FDC entered into negotiations with Midland for restructuring of its loan because of delinquent payments and related problems which had arisen in 1991. The parties signed a modification agreement which provided for a lump sum payment of $75,644 by FDC to Midland and execution of a new promissory note to cover interest that had accrued due to the delinquency. On May 6, 1992, FDC made a payment of $82,673. This amount included the lump sum payment specified in the modification agreement. The check was not deposited by Midland until May 27, 1992.

From May 1992 until July 1993, FDC made payments due Midland under the modification agreement. However, the August payment was not made until late October and no further payments were made. In August, Midland declared FDC to be in default. On August 25, 1993, Midland exercised its rights under the assignment clause and notified the remaining West Roads Shopping Center tenants that future payments should be made to Midland. Mercy did not receive this notification as it was no longer a tenant at that time. Midland ultimately commenced a foreclosure action against FDC and obtained a judgment and decree of foreclosure on March 21, 1994. Midland purchased the property at the sheriff's sale for a loan loss of approximately $900,000.

Midland sued Mercy claiming it breached the estoppel certificate by paying rent in advance and modifying the lease agreement without Midland's consent. The district court granted partial summary judgment to Midland on the issue of liability, finding as a matter of law that Mercy had breached the estoppel certificate. A jury trial was held to determine the amount of damages Midland suffered as a result of the breach. At trial, the parties stipulated that the maximum amount of damages incurred as a result of Mercy's breach was $154,150.71. The jury returned a verdict of $100,000. Mercy moved for entry of judgment notwithstanding the verdict, which the district court denied. Mercy appealed and the case was transferred to the court of appeals.

In its appeal, Mercy argued the district court erred as follows: (1) in denying Mercy's motion for judgment notwithstanding the verdict, which alleged the jury's verdict was excessive and not supported by substantial evidence; (2) in failing to instruct the jury about the rights between assignees and obligors (this alleged error was based on Mercy's claim that it was entitled to a credit for the amount of the payments FDC owed Mercy under the expansion agreement); (3) in refusing to allow Mercy to enter into evidence alleged admissions by Midland and contents

of an affidavit; ·and (4) in failing to grant its motion for a new trial.

The court of appeals affirmed in part, reversed in part and remanded for entry of judgment for Midland in the amount of $71,-477.71. It found that Mercy was entitled to a credit of $82,673, the amount of the lump sum payment made in May 1992 from FDC to Midland under the restructured loan. The court based its decision on the concept that in the event of a breach, the nonbreaching party is entitled to be placed in the position it would have occupied had no breach occurred. It concluded that mandating payment of the entire amount of the remaining lease payments from May 1992 until the end of the lease would place Midland in a better position than if no breach had occurred; in essence it would receive double payment because of the lump sum payment in May 1992. The court of appeals affirmed, without discussion, several other alleged errors regarding the jury's calculation of damages. The court of appeals also affirmed on Mercy's other claims of error. Both parties sought further review from the decision of the court of appeals.

In its application for further review, Mercy raises only the allegation that the jury's verdict was excessive. Mercy contends the court of appeals was correct in reducing the damage award by the amount of the lump sum payment, but that the court erred in not reducing the amount further on other grounds. In Midland's application for further review, it contends the court of appeals erred in reducing the damage award by the amount of the lump sum payment and argues the collateral source rule should apply to prevent such a reduction.

## II. Scope of Review

We review a district court's grant or denial of a motion for judgment notwithstanding the verdict for the correction of errors at law. Iowa R.App. P. 4; *Magnusson Agency v. Public Entity Nat'l Co.-Midwest,* 560 N.W.2d 20, 25 (Iowa 1997). We view the evidence in the light most favorable to the nonmoving party, in this case Midland, and we take into consideration every legitimate inference that may fairly and reasonably be made. Iowa

R.App. P. 14(f)(2). The motion must stand or fall on the grounds raised in the motion for directed verdict. *Magnusson,* 560 N.W.2d at 25 (citing *Vaughan v. Must, Inc.,* 542 N.W.2d 533, 538 (Iowa 1996)).

A motion for judgment notwithstanding the verdict is properly denied if there is substantial evidence to support each element of the plaintiff's claims. *Id.* Evidence is substantial when a reasonable mind would find the evidence presented adequate to reach the same findings. *Id.* (citing *Willey v. Riley,* 541 N.W.2d 521, 526 (Iowa 1995)). Thus, on our review we must determine whether there is substantial evidence to support the jury's award of damages in the case at bar.

## III. Collateral Source Rule

Before discussing the calculation of damages in a breach of contract case, we consider an issue raised by Midland in its application for further review. The court of appeals reduced the damage award by the amount of the lump sum payment from FDC to Midland on the ground that Midland would otherwise receive double recovery. Midland contends that pursuant to the common-law collateral source rule, Mercy is not entitled to a credit for this payment.

We begin with an examination of the common-law collateral source rule in Iowa. Under this rule:

a plaintiff's recovery of damages against a tort defendant are not reduced by sums the plaintiff has received or will receive from another source (a collateral source).

*Collins v. King,* 545 N.W.2d 310, 311 (Iowa 1996). We have previously held that only certain types of payments and benefits fall within the ambit of the collateral source rule. *Farmers State Bank v. United Cent. Bank,* 463 N.W.2d 69, 71 (Iowa 1990) (citing Restatement (Second) of Torts § 920A cmt. c (1979)). The Restatement provides that the following types of payments and benefits qualify as collateral source payments which do not reduce the plaintiff's recovery: insurance policies, employment benefits, gratuities, and social legislation benefits. Restatement (Second) of Torts § 920A cmt. c (1979).

■ One effect of the collateral source rule that is criticized by defendants is that when a plaintiff receives collateral benefits which are not subject to a right of subrogation and subsequently receives compensation for the same injuries via a tort suit against the defendant, the plaintiff receives duplicate damages. *Collins*, 545 N.W.2d at 311. This is commonly referred to as "double dipping." *Id.* This result, however, is viewed under the common law as preferable to the alternative scenario, in which the tortfeasor would receive credit for payments to the plaintiff from a collateral source and would not be held responsible for the full consequences of his or her tortious conduct. *Id.* at 312.

■ We find that the common-law collateral source rule does not apply in the case at bar for two distinct reasons. First, we find that the common-law collateral source rule does not apply to payments like the one made by FDC to Midland. Generally, payments to which the collateral source rule applies to prevent the reduction of a plaintiff's damage award are payments made by a third party to compensate the plaintiff for injuries caused by the defendant. Here, the payment from FDC was not made to compensate Midland for Mercy's breach of contract. It was a payment made pursuant to FDC's own contract with Midland, the modified loan agreement. In short, we find that this is not the *type* of payment to which the collateral source rule applies.

*Farmers State Bank v. United Central Bank* is our only prior case discussing the common-law collateral source rule in the context of a breach of contract action. In *Farmers*, the plaintiff bank sued another bank, United, that had entered into a loan participation agreement with it for three loans to a particular borrower. When the loan came due, Farmers desired to consolidate the loans into one. At this point, United refused to continue as a loan participant. Farmers' parent corporation was required to participate in the loan to prevent Farmers from exceeding its legal lending limit as prescribed by banking regulations. Following a loss on the loan, Farmers sued, arguing United was liable for an amount of the loss proportionate to the amount of its original participation. The district court determined that Farmers had not suffered any damages because the parent corporation had assumed the loan participation agreement and the parent corporation had no contractual or other relationship with United. On appeal, Farmers contended that the collateral source rule should apply. It argued that the parent corporation's payment was from a source other than the wrongdoer and should not be credited against United's liability.

We found that the payment from the "other source" in this case was "not a benefit that invokes the collateral source rule." *Farmers State Bank,* 463 N.W.2d at 72. We noted that the parent corporation's payment "can neither be traced to an insurance policy, employment benefit, nor to any of the other categories of payments or benefits envisioned . . . in the Restatement rule comment." *Id.* Our decision in *Farmers* was based on the fact that the payment at issue was not the type of payment or benefit to which the collateral source rule applies. *Id.* Similarly, we find that the lump sum payment made by FDC is not a payment or benefit that invokes the collateral source rule.

■ We also reject Midland's argument regarding the collateral source rule on the ground that the rule should not be applied in pure breach of contract cases, based on the rationale behind the collateral source rule and the principles underlying the calculation of damages in a breach of contract action. One significant purpose of the collateral source rule in tort actions, as mentioned above, is to prevent the tortfeasor from a windfall when some or all of the plaintiff's damages are paid from another source. Offsetting such payments against the plaintiff's damages would benefit the defendant, the culpable party. *See* Christian D. Saine, Note, *Preserving the Collateral Source Rule: Modern Theories of Tort Law and a Proposal for Practical Application,* 47 Case W. Res. L.Rev. 1075, 1077 (1997). The rule is also intended to have both a punitive and a deterrent effect. *Id.* at 1078.

These proffered justifications for application of the common-law collateral source rule in tort actions have little or no applicability

to breach of contract actions. As noted in the Restatement:

> The principle that a party's liability is not reduced by payments or other benefits received by the injured party from collateral sources is less compelling in the case of a breach of contract than in the case of a tort.

Restatement (Second) of Contracts § 347 cmt. e (1979). The principle behind the collateral source rule is less compelling in contract actions because of the inapplicability of the deterrence factor in such cases and the countervailing principle that "no one should profit more from the breach of an obligation than from its full performance." 22 Am. Jur.2d *Damages* § 568 (1988).

Standard principles of contract damages reinforce the notion that the common-law collateral source rule should not apply in breach of contract actions. Typically, the nonbreaching party's recovery is limited to "the loss he has actually suffered by reason of the breach." *Id.* § 45. "[T]he measure of damages for the breach of a contract is the amount which would have been received if the contract had been performed." *Id.* Thus, damages in the breach of contract setting are intended to be compensatory only, not punitive in nature. Application of the common-law collateral source rule in contract actions would contravene this principle by awarding the nonbreaching party more damages than necessary to compensate it for the breach.

Several jurisdictions have considered whether the common-law collateral source rule should apply in breach of contract actions. With little exception, the majority of these courts has concluded that the rule should not apply outside the realm of tort actions. *See Centon Elecs., Inc. v. Bonar,* 614 So.2d 999, 1004 (Ala.1993) (noting that "collateral source rule is not applicable to a claim for breach of contract"); *Grover v. Ratliff,* 120 Ariz. 368, 586 P.2d 213, 215 (Ct. App.1978) (holding that "collateral source rule is a concept of damages in tort cases and does not apply to an ordinary breach of contract case"); *Patent Scaffolding Co. v. William Simpson Constr. Co.,* 256 Cal. App.2d 506, 64 Cal.Rptr. 187, 191 (1967) (noting that the collateral source rule "has not

been generally applied in cases founded upon breach of contract unless the 'breach has a tortious or wilful flavor' ") (citations omitted); *City of Miami Beach v. Carner,* 579 So.2d 248, 253–54 (Fla.Dist.Ct.App.1991) (collateral source rule not applicable in pure breach of contract cases; in contract cases, "measure of damages is the plaintiff's injury, rather than the defendant's culpability"); *Amalgamated Transit Union Local 1324 v. Roberts,* 263 Ga. 405, 434 S.E.2d 450, 452 (1993) (same); *American Fidelity Fire Ins. Co. v. General Ry. Signal Co.,* 184 Ill.App.3d 601, 132 Ill.Dec. 817, 540 N.E.2d 557, 568 (1989) (noting that "[i]n Illinois, the collateral source rule applies in contract cases only where there is an element of fraud, tort, or willfulness"); *Corl v. Huron Castings, Inc.,* 450 Mich. 620, 544 N.W.2d 278, 286 (1996) (holding that "collateral source rule does not apply in cases of common-law contract"); *Hurd v. Nelson,* 714 P.2d 767, 771 (Wyo. 1986) (noting that "payment from a collateral source may satisfy a contractual obligation"); *see also* 22 Am.Jur.2d *Damages* § 568 (1988) (listing cases supporting proposition that collateral source rule should not apply in breach of contract cases). *But see Masterson v. Boliden–Allis, Inc.,* 19 Kan.App.2d 23, 865 P.2d 1031, 1035 (1993) (finding collateral source rule applicable to prevent reduction of damage award by amounts of social security and pension benefits received by plaintiff in case involving breach of implied employment contract); *Hubbard Broad., Inc. v. Loescher,* 291 N.W.2d 216, 223 (Minn.1980) (concluding that collateral source rule "may be invoked in a contract case under the proper circumstances" and noting that in the case at bar the party "would *not* be overcompensated for his loss" if the rule was employed to prevent a reduction in damages).

■ We conclude based on logic and weight of authority from other jurisdictions, that the common-law collateral source rule should not apply in pure breach of contract actions. We leave to future cases the issue of whether this rule should be absolute or should allow application of the collateral source rule in contract actions which involve tortious or wilful conduct by the defendant.

## IV. Damages in Breach of Contract Cases

Having dispensed with Midland's argument that the common-law collateral source rule should apply to prevent Mercy from receiving credit for the lump sum payment from FDC to Midland, we address the central issue of this case—whether the jury's award of damages is supported by substantial evidence.

### A. General Principles of Contract Damages

 Under Iowa law, when a contract has been breached the nonbreaching party is generally entitled to be placed in as good a position as he or she would have occupied had the contract been performed. *Magnusson,* 560 N.W.2d at 27; *see also* Restatement (Second) of Contracts § 344(a) (1979); 22 Am.Jur.2d *Damages* § 43 (1988). This type of damages is sometimes referred to as the injured party's "expectation interest" or "benefit of the bargain" damages. *Magnusson,* 560 N.W.2d at 27 (citing 22 Am.Jur.2d *Damages* § 45). Under this theory of damages, the nonbreaching party's recovery "is limited to the loss he has *actually suffered by reason of the breach;* he is not entitled to be placed in a better position than he would have been in if the contract had not been broken." 22 Am.Jur.2d *Damages* § 45 (1988) (emphasis added).

 In determining the amount of damages, we must also be mindful that "the measure of damages recoverable for a breach of contract in each case must have relation to the nature and purpose of the contract itself, as viewed in connection with the character and extent of the injury." *Id.* § 44. In addition, courts must also consider the foreseeability of damages. In *Kuehl v. Freeman Bros. Agency, Inc.,* 521 N.W.2d 714, 718 (Iowa 1994), we stated:

> [D]amages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement.... Damages which a reasonable person would expect to follow from breach of a contract are direct and thus should be awarded.

### B. Whether the Jury's Award of Damages Is Supported by Substantial Evidence

We must now determine whether the jury's calculation of damages is supported by substantial evidence utilizing the principles of contract damages set forth above. This entails a consideration of whether the amount of damages awarded by the jury places Midland in the same position as if the contract had been performed, in which case the award of damages must stand, or places Midland in a better position than if the contract had been performed, in which case the award of damages is excessive as a matter of law.

The parties stipulated at trial that the maximum amount of damages suffered by Midland as a result of Mercy's breach of the estoppel certificate was $154,150.71. This amount represents the total amount of rent, CAM charges, real estate taxes and insurance owed by Mercy under the lease agreement from May 1, 1992, through the end of the lease term, January 31, 1994. The jury awarded Midland $100,000.

The main consideration in evaluating the jury's award of damages is determining the amount of damages *caused by* Mercy's breach of the estoppel certificate. This consideration involves the examination of not only Mercy's actions, but also the actions of FDC. This is so because Mercy did not directly owe Midland any money until the assignment clause was activated on August 25, 1993. Prior to that time, Mercy's obligation under the lease was to FDC, who in turn owed money to Midland under the loan agreement and promissory note.

#### 1. The Effect of the Breach Prior to FDC's Default in August 1993

 Although Mercy breached the estoppel certificate in May 1992, FDC continued to make regular payments on its restructured loan with Midland through July 1993. Therefore, even though the breach occurred much earlier, Midland did not sustain any damages from the breach until August 1993, when Midland declared FDC to be in default and activated the assignment clause effective for the tenants' October rent payments.

This conclusion flows from a consideration of the purpose and intent of the estoppel certificate. *See* 22 Am.Jur.2d *Damages* § 44 (1988). Ron Folian, a representative of Midland, testified at trial as to the purpose of the estoppel certificate. Folian testified that one purpose of the provision in the estoppel certificate prohibiting prepayment of rent was to "guarantee[ ] the lender that there will be money in place [for the borrower] to make a monthly ... debt service payment." Thus, the estoppel certificate was intended to ensure that FDC would receive regular monthly payments from its tenants with which to make its loan payments to Midland. Even though Mercy breached the estoppel certificate in May 1992, FDC continued to make payments under the modification agreement until Midland declared a default in August 1993. Thus, despite Mercy's breach, the underlying purpose of the estoppel certificate, to ensure FDC could make its monthly loan payments, although present, was not needed by Midland for legal effect until September 1993, because FDC continued to make monthly payments until August 1993 when Midland declared a default and activated the assignment clause.

We conclude that no damages could have arisen from Mercy's breach of the estoppel certificate until Midland declared a default in August 1993 and exercised its rights under the assignment clause. Until that time, FDC made all payments required under the modification agreement and Midland did not suffer damages as a result of Mercy's breach. Therefore, the maximum amount of damages for which Mercy is liable is the amount of rent and other payments Mercy owed under the original lease for the five-month period from September 1993 through January 1994. (Although the last regular monthly payment made by FDC occurred in July 1993, Midland received a loan payment for August in October 1993.) This amount totals $37,-773.35. (Monthly rent ($6,739.89), CAM charges ($336.47), insurance ($44.80) and taxes ($433.51) totaled $7,554.67.) Thus, the jury's verdict of $100,000 is excessive and not supported by substantial evidence.

## 2. Whether Midland's Damages Should Include Common Area Maintenance (CAM) Charges, Insurance and Taxes

Mercy argues that the damages caused by its breach of the estoppel certificate cannot include the other charges in addition to rent which were included in its monthly payment to FDC. Mercy's claim is based on the language of the estoppel certificate, which prohibits "rent" from being paid more than one month in advance. Mercy reads this language literally to mean that prepayment of other charges was not prohibited by the estoppel certificate and therefore no breach occurred from the prepayment of those amounts. The estoppel certificate provides:

> The undersigned [Mercy] agrees that neither you [Midland] as the holder of the mortgage ... nor any purchaser pursuant to a foreclosure proceeding shall be bound by any prepayment by us of more than one month's installment of rent or other change or modification of the Lease ... without your written consent.

Midland contends that the language of the estoppel certificate does prohibit Mercy's prepayment of CAM charges, insurance and taxes. The original lease agreement provided that payment of these items would be made on a monthly (CAM charges and insurance) or yearly (real estate taxes) basis. Midland argues that Mercy breached the estoppel certificate by paying these amounts in advance because the estoppel certificate prohibits any "change or modification of the Lease ... without [Midland's] written consent." Midland maintains that changing the timing of these payments constituted a modification of the lease which was specifically prohibited by the estoppel certificate.

We agree with Midland that Mercy's prepayment of CAM charges, insurance and taxes constituted a modification of the lease and concomitantly a breach of the estoppel certificate. Thus, Midland is owed any damages which were caused by that breach. As established in the previous section, Midland did not sustain damages until FDC stopped paying its monthly payments under the modification agreement in September 1993. Therefore, any CAM charges, insurance and taxes which accrued during the period of

September 1993 through January 1994 are damages which must be paid by Mercy. We conclude that Mercy is not entitled to a further reduction in the amount of damages it owes Midland. The amount of damages stands at $37,773.35, the total of all payments Mercy owed under the lease agreement from September 1993 through January 1994.

3. Whether Midland's Damages Should Be Reduced by the Payments Owed Mercy by FDC Under the Expansion Agreement

■ The expansion agreement was part of the original agreement between Mercy and West Roads. Under the expansion agreement, West Roads was required to construct an addition to the shopping center to provide additional space for Mercy's clinic. The agreement provided that if West Roads did not begin construction on the addition within twenty-four months, it was required to pay the negative cash flow on a building in Indianola owned by Mercy. West Roads never constructed the addition and thus the terms of the expansion agreement were already activated when FDC purchased the shopping center in 1990 and assumed this obligation. Mercy contends that it should receive a credit against the damages it owes Midland for the amount due under the expansion agreement.

As part of the loan agreement between FDC and Midland in January 1990, FDC was required to execute an "assignment of rents and leases." This document assigned all of FDC's interest in leases with its various tenants to Midland. As long as no default had occurred, FDC was granted a revocable license to "collect and receive all rents, revenues, profits and income." In the event of a default, the license would be automatically revoked by Midland.

■ We begin our analysis with the general principles of assignment and delegation. An assignment is a transfer of rights. *See* 6A C.J.S. *Assignments* § 2 (1975). "By an assignment, the obligee as *assignor* ... transfers to an *assignee* ... a right that the assignor has against an *obligor*." E. Allan Farnsworth, *Farnsworth on Contracts* § 11.1, at 58 (1990). "In such transfers, the assignee assumes the rights, remedies and benefits of the assignor." *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995).

■ Duties or liabilities under a contract, however, are not assigned, they are delegated, a concept distinct from assignment. "An obligor's empowering of another to perform the obligor's duty is known as a *delegation* of the performance of that duty." Farnsworth § 11.1, at 58–59. Often, parties do not "distinguish between these words of art." *Barker Dev. Co. v. Unibank & Trust Co.*, 314 N.W.2d 175, 178 (Iowa App.1981). The effect of the failure to distinguish between these terms is addressed by the Restatement:

> Unless the language or the circumstances indicate the contrary, ... an assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of the assignor's rights and a delegation of his unperformed duties under the contract.

Restatement (Second) of Contracts § 328(1) (1979).

In the assignment agreement between Midland and FDC, FDC assigned its "right, title and interest in, to and under all leases, ... together with all rights, powers, privileges, options and other benefits ... and all the rents, revenues, profits and income." Unlike many parties, FDC and Midland did distinguish between the concepts of assignment and delegation in the assignment agreement. A clause at the end of the agreement provides:

> The assignment made hereby is an absolute and unconditional assignment of rights only, and *not a delegation of duties*. The execution and delivery hereof shall not in any way impair or diminish the obligations of [FDC] under the provisions of each and every Lease nor shall any of the obligations contained in the Leases be imposed upon [Midland].

(Emphasis added.)

Mercy contends that FDC's assignment of rents and leases to Midland was also a delegation of FDC's duties and obligations under the expansion agreement. We conclude that Mercy's argument cannot prevail for two rea-

sons. First, even if the language of the assignment agreement could be construed as a delegation as well, this would only operate to delegate FDC's duties under the *lease agreement* with Mercy. Any alleged delegation found in the assignment of rents and leases would not affect the rights and obligations as between Mercy and FDC contained in the expansion agreement. The lease agreement and expansion agreement were two separate and distinct contracts. Therefore, we find that even if the assignment of rents could be construed as a delegation of duties as well, that delegation would not apply to the duties established between the parties in the expansion agreement.

Second, the language in the assignment of rents and leases indicates that the parties did not intend for the document to constitute a delegation of duties. This is evidenced clearly by the language of the agreement, which states: "The assignment made hereby is an absolute and unconditional assignment of rights only, and not a delegation of duties." The language of the assignment agreement indicates that no delegation of duties was to occur. *See* Farnsworth § 11.10, at 126. Furthermore, the assignment is not written in general terms such as "all rights under the contract," which could generate confusion as to the intent of the parties.

Mercy also argues the principle that "an assignee takes precisely what the assignor had, and assumes not only the advantages, but is subject to the same defenses that would be available against the assignor." While we have previously recognized this principle, *see Smith v. Brown*, 513 N.W.2d 732, 733–34 (Iowa 1994), it is not applicable to Mercy's argument that Midland is liable for FDC's duties under the expansion agreement. This principle means that "the assignee is vulnerable to defenses of the obligor *that affect the enforceability of the obligor's agreement with the assignor.* These include unenforceability for lack of consideration, reasons of public policy, or failure to satisfy the statute of frauds." Farnsworth § 11.8, at 106 (emphasis added). The claim Mercy is raising does not "affect the enforceability" of the expansion agreement between Mercy and FDC. Rather, Mercy is contending that Mid-

land assumed FDC's duties and obligations, an entirely different claim to which the principle advanced by Mercy does not apply.

4. Whether Midland Should Receive Further Damages Under the Finish Agreement

Midland, in its resistance to Mercy's application for further review, suggests that it should receive further damages for Mercy's obligations under the finish agreement between Mercy and FDC. This contention was not raised at the district court level. Furthermore, the parties stipulated as to the maximum amount of damages and this amount included only rent, CAM charges, taxes and insurance, not amounts due under the finish agreement. Thus, Midland's argument comes too late for our consideration.

5. Whether Midland Failed to Establish Any Damages Were Caused by the Breach

As a final argument, Mercy contends that Midland failed to prove any damages were caused by its breach of the estoppel certificate. We conclude that there was substantial evidence presented by which the jury could conclude that some damages were caused by Mercy's breach of the estoppel certificate. If Mercy had complied with the terms of the estoppel certificate and obtained consent from Midland before modifying the lease agreement, Midland would likely have taken steps to ensure it would receive all money paid to FDC under any sort of settlement. Thus, Midland did sustain damages as a result of Mercy's breach of the estoppel certificate to the extent that it did not receive payment from FDC for the lease payments FDC received in advance from Mercy via the lease termination agreement. Mercy's contention that Midland may have approved the termination agreement in exchange for a lump sum payment of $82,673 is purely speculative and the jury could have concluded as such.

V. Conclusion

On our review of the claims raised in the parties' applications for further review, we find that there is not substantial evidence to

support the jury's award of damages in the amount of $100,000. Because our calculation of damages proceeds from a different theory than used by the court of appeals, our finding of the amount of damages varies from that found by the court of appeals. We conclude as a matter of law that Mercy could not have sustained damages as a result of the breach until it declared FDC to be in default and exercised its rights under the assignment clause. Thus, we find that Midland is entitled to damages in the amount of $37,773.35. This amount will place Midland in as good a position as if the estoppel certificate had not been breached. We therefore remand for entry of judgment for Midland in that amount.

**DECISION OF COURT OF APPEALS VACATED IN PART AND AFFIRMED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; REMANDED FOR ENTRY OF JUDGMENT.**