# IN THE COURT OF APPEALS OF IOWA

No. 16-0919
Filed July 19, 2017

**DAVID BERTRAM,**
　　　　Plaintiff-Appellant,

**vs.**

**JAMES HARBERTS d/b/a EXCLUSIVE CONTRACTING L.L.C.,**
　　　　Defendant-Appellee.
_____

　　　　Appeal from the Iowa District Court for Grundy County, David P. Odekirk,

Judge.

　　　　The plaintiff appeals from part of the district court's ruling on a breach of

contract case. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

　　　　Michael McDonough, Jacob W. Nelson, and Crystal R. Pound of Simmons

Perrine Moyer Bergmann PLC, Cedar Rapids, for appellant.

　　　　Chad A. Swanson (until withdrawal) and Nathan J. Schroeder (until

withdrawal), Waterloo, for appellee.

　　　　Considered by Vogel, P.J., Doyle, J., and Blane, S.J.*

　　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**BLANE, Senior Judge.**

David Bertram appeals from the district court's ruling in an action involving claims and counterclaims for breach of contract. Bertram challenges the district court's conclusion he materially breached the written contract into which he and the defendant, James Harberts, d/b/a/ Exclusive Contract, L.L.C., entered. Additionally, he challenges the district court's ruling regarding damages.

## I. Background Facts and Proceedings.

Bertram, a farmer, wanted a pole barn constructed on his land. Sometime in 2012, he contacted Harberts,[1] an experienced builder.

After some back and forth regarding proposals and estimates, Harberts completed a written contractor's agreement on June 3, 2013, and submitted it to Bertram. The parties signed the agreement on June 25. The agreement provided Harberts would build an 80 foot by 105 foot pole barn, complete with concrete floors, spray-foam insulation, and the framing for a number of interior walls and doorways. The total cost—$265,210.00—included the necessary supplies and labor. Bertram, by the terms of the agreement, was to initially pay Harberts "$172,386.50 (reflecting 65% of total cost) . . . before work beg[an]. After assembly and construction of [the] building[], a predetermined amount of $66,302.50 (reflecting 25% of total cost) [was to] be paid to the Contractor. After interior floor installation ha[d] been completed, a predetermined amount of $26,521.00 (reflecting 10% of total cost)" was to be paid to Harberts. The contract also specified what Harberts was not responsible for, including the large "overhead doors and openers," among other things.

---

[1] We refer to both the defendant and his business as Harberts throughout.

Bertram maintained he and Harberts had also agreed orally, before signing the contract, both that Harberts would have the building completed "by winter" and that Harberts would keep the money Bertram gave to him for the project in a separate account. Harberts agreed he gave Bertram a projected completion date and that he hoped to have the project completed by winter, but he disagreed that the completion date was a contractual term. Additionally, Harberts testified he never told Bertram his money would be kept separate from the money Harberts' business was receiving for other projects. Bank records introduced at trial showed that Bertram's money was deposited into Harberts' business account, along with the funds for other projects.

Bertram made the first payment to Harberts of $172,386.50 on or about the day the contract was signed. Harberts began construction at some point in early July. The building itself was up by October 21, 2013, at which time Harberts requested the second installment payment. Bertram made the second payment of $66,302.50.

Around the same time the building was finished, Harberts and Bertram had a discussion about the large overhead doors. Bertram had yet to pick or order the doors, and he had neither hired someone to complete nor personally completed the work that had to be done before the doors could be installed— tasks that were his to undertake and were not within the contract. Harberts advised Bertram he would not complete the insulation or concrete work until after the doors were installed.

After the second payment was made, Harberts and Bertram agreed Harberts' company would complete certain "extras" for Bertram, including

installing the liner panel and doing some work that had to be completed for the overhead doors to be installed.

Bertram chose the overhead doors on November 1; he was told it would take seven to eight weeks for the doors to be delivered. On November 4, Harberts paid the $7051 deposit on the doors.

Bertram wanted Harberts to work on completing the insulation and concrete floor while they waited for the doors to be installed, but Harberts refused to do so. Harberts later testified that he always did flooring last, stating he did not want to drive his heavy equipment over the newly poured floors and wanted to make sure the doors were in place first so he could use the cement work to make sure they sealed tightly.

On December 17, Bertram's attorney sent Harberts a letter indicating "Mr. Bertram does not want any more work performed this winter. You are currently holding $123,490 of Mr. Bertram's money." The letter asked Harberts to "deduct amounts that you expended for the ceiling steelwork and forward the balance of the money" to Bertram's attorney. Harberts did not respond to the letter.

The overhead doors were installed on December 21, and Harberts' company was sent an invoice for the rest of the bill by the door company, totaling $14,452.

Bertram's attorney sent Harberts another letter on January 3, 2014. It stated the attorney had been "instructed" to "demand $135,000 payable to the" firm's trust account to "be held in escrow" at the firm's office until Harberts finished the project. It further indicated that once Harberts "finish[ed] the project

in the spring, that amount" would be paid to him. Harberts was told he had seven days to respond to the letter before Bertram commenced litigation.

The parties then scheduled a meeting, which took place on January 10 at the lending bank. At the meeting, Bertram demanded Harberts immediately resume construction. Harberts testified he agreed he would get back on the job site as soon as the weather allowed. At trial, Bertram expressed that he believed Harberts had agreed to return to work "immediately."

Harberts did not immediately return to the job site. He did submit an invoice to the bank for the "extras" his company had completed and for the amount owed to the door company, totaling $48,153. $21,503 of the balance was for the doors—both the $7051 Harberts had paid in deposit and the remaining balance after installation.

On January 16, both Bertram and his attorney sent Harberts letters. Harberts responded in kind on January 29. No more work was completed on the project before February 18, when Bertram's attorney sent Harberts a letter terminating the contract.

Bertram initiated this lawsuit on April 30. He claimed Harberts had "failed and neglected to complete the construction of the building, ha[d] constructed portions in a defective and unworkmanlike manner, . . . [and had] failed to return the unearned funds paid to [him] despite demand for return of them by [Bertram]." Harberts answered and filed a counterclaim, maintaining it was Bertram who had breached the contract.

The matter proceeded to a bench trial in June 2015. At trial, Bertram and his witnesses testified that the roof of the pole barn was leaking in several areas.

Evidence was introduced that Harberts and his employees had incorrectly placed nails, which had left holes in the roof. Additionally, the overlap of the metal panels was less than recommended by the manufacturer. The cost for the replacement of the roof would be $32,486.70.

The court issued its written ruling on January 8, 2016. The court found that neither the winter completion date nor the segregation of funds from other business monies were terms that had been integrated into the contract. The court then concluded Harberts had materially breached the contract by failing to complete the building in a workmanlike manner. "This material breach, made prior to the final payment becoming due, excuses [Bertram's] payment of the final contract payment." The court awarded Bertram the following damages: $1905 to replace gutters; $2400 to fix problems with the installation of the side paneling; $32,486.70 to replace the roof. However, the court determined Bertram did owe Harberts for the "extras" that he had performed, in the amount of $32,701.[2] Additionally, the court found that it was the fault of Bertram, not Harberts, that the project was never completed. The court ruled:

> The Court finds [Bertram] should not receive damages for the installation of the concrete floors, insulation, or interior walls, and he will also not receive damages to fix the drip cap, replace the ceiling panels, or to regrade the floors. The work on the barn was not complete at the time [Bertram] terminated the contract, nor was it required to be complete because the reasonable time for completion had not yet passed. As a result, [Harberts] was excused from further performance on these portions of the project.

---

[2] Although it was Harberts' company that was billed by the door company, Bertram had paid the balance directly. Thus, the total was comprised of the deposit Harberts paid to the door company, the fur and coil around the door, the liner panel ceiling, the extra footing required after Bertram changed the plans for the interior framing, and the grade and compact for plumbing.

The court offset the damages owed to Bertram for the construction issues with the extras still owed and entered judgment in favor of Bertram in the amount of $4090.70.

Bertram filed a motion pursuant to Iowa Rule of Civil Procedure 1.904(2), asking the court to "expand and enlarge findings and legal conclusions and modify the judgment accordingly to award [Bertram] a money judgment for either the return of unearned funds prepaid to [Harberts] or for the additional costs of completion caused by [Harberts] breach of contract." Bertram maintained that Harberts was entitled to only the reasonable value of the work he actually performed—not payments for the insulation, concrete flooring, or interior framing. Bertram claimed the value of the completed work was only $145,300 and asked the court to order Harberts to return $93,389 in "pre-payments" that he received.

In its written ruling on the motion, the court amended its previous order "to clarify [Bertram] not only partially breached when he failed to pay for the contract extras, but also materially breached on the contract when he frustrated the construction process and wrongfully terminated the contract on February 18, 2014." The court determined Bertram was not entitled to the return of any "prepayments" because Harberts "credibly testified at trial that he had prepaid for materials and labor prior to [Bertram's] termination of the contract and would have been able to complete the project had he been allowed to do so." The court altered its ruling on Harberts' breach, concluding, "[T]he Court amends its prior findings to find that this constituted a partial breach of the warranty of workmanlike construction, not a material breach of the contract."

Bertram appeals.[3]

## II. Standard of Review.

"A breach-of-contract claim tried at law to the district court is reviewed by us for correction of errors at law." *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 465 (Iowa 2010). Although "[t]he district court's findings of fact have the effect of a special verdict[,]" "[t]he trial court's 'legal conclusions and application of legal principles are not binding on the appellate court.'" *Id.* (citations omitted). "We will reverse a district court's judgment if we find the court has applied erroneous rules of law, which materially affected its decision." *Id.*

## III. Discussion.

The district court found that there was no contractual term regarding the completion date of the project and determined a reasonable time for completion would have been the spring of 2014, rather than the winter of 2013. *See Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 619 (Iowa 1999) ("When a contract fails to specify time for performance, the parties must perform within a reasonable time."). Thus, the court determined Harberts was not yet in breach of the contract when Bertram cancelled the agreement in February 2014.

Bertram maintains the district court erred in its determination; he asserts the court based its finding on an inaccurate memory of Harberts' testimony regarding the number of workers he had, the court faulting Bertram for the delay

---

[3] Harberts' attorneys were permitted to withdraw from these proceedings during appeal. Harberts did not enlist another attorney to file an appearance on his behalf, and Harberts—as a non-attorney—was not allowed to represent a corporation. *See Timberline Builders, Inc. v. Donald D. Jayne Trust*, No. 09-0168, 2010 WL 2383916, at *1–4 (Iowa Ct. App. June 16, 2010). Thus, his cross-appeal was dismissed, and he has filed no appellate brief in this matter.

because of his failure to order the overhead doors created an implied condition precedent that was not actually part of the contract, and Bertram's January 2014 letter allowing Harberts "until spring" to complete the project was not a waiver of Harberts' deadline to complete the contract.

What constitutes "a reasonable time depends upon the nature of the act to be done, the nature of the contract, and all the circumstances relating to the same." *R.P. Andreas & Son v. Hempy*, 276 N.W. 791, 796 (Iowa 1937). Here, based on the circumstances surrounding the completion of the contractor's agreement, we agree with the district court's finding that spring 2014 was a reasonable time. Despite Bertram's protestations, the court was correct to attribute some of the delay in finishing the project to him. Bertram failed to order the overhead doors in a timely fashion, which prevented them from being installed until December 21, 2013. The contract was silent as to whether the overhead doors needed to be installed before Harberts would complete the insulation and concrete floor, but Harberts testified he always left flooring for last in his construction projects because of possible issues with or damage to the floor that could occur during other parts of construction. Furthermore, Bertram's own construction expert testified "it is the contractor [as opposed to the owner] that controls the sequencing of the erection of the building through means and methods." Iowa Code section 554.2202(1) (2014) allows the court, when reading a written contract between two parties, to consider the "usage of trade" to explain or supplement the written terms. *See* Iowa Code § 554.1303(3) (defining a "usage of trade" as "any practice of method of dealing having such regularity of

observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question").

Because Harberts had the authority to decide the insulation and flooring would not be completed until the doors were installed and Bertram's delay in ordering the doors prevented them from being installed until December 21, it would not be reasonable to determine the project should have been finished before that date. And on December 17, Bertram had sent Harberts a letter telling him to suspend all work "for the winter." Following a January 10 meeting, Harberts expected to return to work on the project, so it could be completed by spring 2014, but the weather in the days directly following the meeting interfered, and Bertram sent Harberts another letter with new demands on January 16. In these circumstances, spring 2014 is a "reasonable time" for completion.[4] We agree with the district court that Bertram materially breached the contract when he cancelled it before the reasonable time for the project to be completed had passed.

Next, we consider the district court's conclusion Harberts was entitled to keep all of the "prepayments" for work he was never obliged to complete. "Under

---

[4] We note that Bertram makes a number of arguments regarding the district court's alleged error involving his expert's estimate, in a chart, of a reasonable completion date. While we agree that we could simply move the start date on the chart back to match the actual date construction started, we believe there are other issues with the chart. First, Harberts testified he "had [a crew of] four guys and then one guy was [his] mechanic." However, the expert's estimates were not always based on that number. For example, his chart states the concrete can be laid in two days, but the expert admitted at trial that was based on a nine-person crew. The expert's chart also showed that construction work would continue in the barn two days after the concrete was poured, but he testified the flooring required a seven-day cure time. In contrast, Harberts testified, "[D]uring 70- or 80-degree weather during the summertime, six inches of concrete can take 28 days to cure out, and it's still not completely cured. Well, if you're driving a 21,000 pound lift on it, it has to cure for at least that in the wintertime and be heated while it's curing."

Iowa law, when a contract has been breached the nonbreaching party is generally entitled to be placed in as good a position as he or she would have occupied had the contract been performed." *Midland Mut. Life Ins. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998). While this allows the nonbreaching party to receive the benefit of the bargain, it does not allow him "to be placed in a better position than he would have been in if the contract had not been broken." *Id.* Here, the district court concluded Bertram was not entitled to receive any of his money back because Harberts had pre-paid for materials and labor before the termination of the contract. We are not convinced the record supports such broad findings, and insofar as they are supported, Harberts is required to at least give Bertram the materials that were purchased for the completion of his project or, if such materials were used by Harberts on other projects, reimburse Bertram their cost.

Harberts is entitled to keep his expected profits. *Ritam Corp. v. Applied Concepts, Inc.*, 387 N.W.2d 619, 622 (Iowa Ct. App. 1986). He is not required to reimburse Bertram for any "pre-paid" labor that he was not then allowed to utilize on the project. *Id.* at 621 ("When a contract is breached, the nonbreaching party is entitled to recover profits from the breach equal to the net pecuniary gain represented by gross pecuniary gains diminished by cost of obtaining them."). But Harberts is not allowed to keep more than he would have received if the contract had been completed. Harberts testified he had purchased interior doors for the project and still had them; those should be given to Bertram, or if Harberts no longer has them, then Harberts should pay Bertram the purchase price. Additionally, while Harberts told Bertram at various times before the contract was

cancelled that he had already purchased certain materials, Harberts testified differently at trial. He stated he "had 70 percent of the insulation already purchased, but now [he had] used it on other jobs so it didn't expire." Harberts should not be able to recover the value for the 30% of insulation Bertram had not yet purchased. Harberts also cannot be benefitted by the cancellation of the contract such that he is allowed to use Bertram's insulation to complete other jobs. Similarly, Harberts testified he had used $12,000 to $14,000 of the concrete to create the frost footings. The contract shows the "concrete floors, wall, and footings" to be worth $56,050. It is unclear if Harberts had prepaid for the concrete, and whether he used that concrete on other jobs, in which case Bertram should be refunded the cost. If Harberts did not prepay, Bertram is to receive the money he prepaid that was not spent to install the concrete floor. However, such amount for concrete work may be reduced by the amount Harberts was required to expend to change the concrete footings due to Bertram changing the design of the pole barn after construction had been started.

The trial court erred in determining that Harberts was not required to return money and materials he had as a result of the job not being finished. Because we are unable to determine from the record before us what materials were actually pre-purchased, what materials Harberts had for the job when the contract was cancelled, and whether they have since been used by Harberts, we remand to the district court to modify the judgment award for Bertram as

necessary in accord with the holding in *Midland Mututal Life Insurance v. Mercy Clinics, Inc.*, 579 N.W.2d at 831.[5]

**IV. Conclusion.**

We affirm the district court's ruling that Bertram materially breached the contract when he cancelled it in February 2014. However, we find the district court erred in its determination of damages; we reverse the award and remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[5] We do not find error with the district court's ruling that Bertram owed Harberts $32,701 for the "extras" he completed as agreed. We also find no error with the district court's ruling that Harberts was responsible for the repair or replacement of the gutters, the damages to side paneling, and the roof—worth $32,486.70.