# IN THE COURT OF APPEALS OF IOWA

No. 13-1358
Filed July 16, 2014

**MEDICAL ASSOCIATES OF
CLINTON, P.L.C.,**
        Plaintiff-Appellant,

**vs.**

**CHRISTOPHER S.E. MARTIN, M.D.,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Clinton County, Nancy S. Tabor,

Judge.


        Medical Associates appeals from a district court judgment for a contract

action tried at law. **AFFIRMED.**


        David M. Pillers and Ryan F. Gerdes of Pillers & Richmond, DeWitt, for

appellant.

        Mark Schwiebert of Schwiebert Law, P.C., Rock Island, Illinois, for

appellee.


        Heard by Vogel, P.J., and Doyle and Mullins, JJ.  Tabor, J., takes no part.

**MULLINS, J.**

Medical Associates of Clinton, P.L.C., appeals the district court's judgment in favor of Dr. Christopher Martin, a former associate physician employed by the clinic. Medical Associates argues (1) there was insufficient evidence to support the district court's finding that the clinic had breached its employment contract with Martin, and (2) there was insufficient evidence to support the district court's finding that the clinic's breach was the reason for Martin's damages.

## I. BACKGROUND FACTS AND PROCEEDINGS

In November 2006, Martin was completing his surgical residency in Michigan when he was approached by a recruiter representing Medical Associates of Clinton, Iowa.[1] He subsequently visited the primary clinic in Clinton to meet and interview with staff members. The clinic also arranged for a realtor to show Martin and his wife several homes for sale in the Clinton area. Martin and the staff of Medical Associates got along well, with one doctor referring to him later as "[a] good surgeon, a good doctor and a good man." Martin accepted the clinic's offer, purchased one of the homes the realtor had shown him, and relocated his family from Michigan to Iowa.

The employment contract between Medical Associates and Martin was for a period of two years, to commence on July 9, 2007. After two years of employment as an associate, Martin would have the opportunity to apply to purchase an ownership interest in the clinic. The contract stated that

---

[1] Medical Associates is a private clinic jointly owned by its physicians who are full members. Its primary clinic is located in Clinton, with four satellite clinics in Iowa and Illinois. As of July 2013, Medical Associates had approximately 320 employees, including thirty-eight physicians.

compensation was to be based on Martin's pro-rata share of the clinic's net profits, the distribution of which was governed by "Policy Bulletin No. 6." According to the "Profit Distribution Formula" of Policy Bulletin No. 6, an associate's share of the net profits was distributed based on two factors: fifty percent on the associate's RVU production[2] and fifty percent on the associate's professional adjusted charge production.[3]  During Martin's first year as an associate his distribution of the clinic's net profits was guaranteed by the contract to be no less than $250,000.

The contract also stated Medical Associates would provide Martin with insurance coverage, to be included in his salary as taxable income.  In the event Martin terminated his relationship with Medical Associates during his first two years, the contract stipulated the clinic would purchase tail insurance for Martin, to be reimbursed by Martin or deducted from any amount the clinic owed him.  In such circumstances, the contract also forbade Martin from practicing medicine within fifty miles of the city of Clinton for a period of two years.

For the first year of his employment Martin was paid a draw of $10,416.17 bi-weekly.  After his first year ended in July 2008, the $250,000 minimum floor on his salary expired and his compensation began to be calculated solely on his pro-rata share of the clinic's net profits, as governed by the formula explained above. Nevertheless, Martin continued to receive the same bi-weekly draw he had

---

[2] RVU stands for Relative Value Units.  It is a system of value measurement for medical service fees, as published and updated by the Federal Register.  In short, it measures the productivity level of a physician during a particular period of time.

[3] A physician's actual charges for professional medical services rendered as adjusted to reflect net insurance carrier, third-party pay or discounts and/or reimbursements, courtesy discounts, other discounts, and any uncollectable accounts.

received over the previous year. In September 2008, at the end of his first quarter since being put on production in July 2008, Martin visited with the company CFO (Chief Financial Officer) to inquire how his draw and production were doing. Although every physician at Medical Associates received monthly reports regarding their personal RVU productivity and adjusted charge production, most relied on the administration and the CFO to determine their draw versus their actual income. The CFO at the time of Martin's employment was James Holstein, who informed Martin in September that his production was on track for him to receive at least the same income as the previous year. Martin made the same inquiry in November, to which Holstein again told him everything was fine. Finally, when Martin asked Holstein in January about his year-end bonus, he was informed by Holstein that his account was overdrawn $48,000.

In response, Martin was told by a senior physician that the clinic would need to decrease his bi-weekly draw "slightly" until the $48,000 was paid back. However, his next draw check was the same as before, and he was soon informed his account had become $68,000 overdrawn and as a result his draw would be reduced by fifty percent. Concerned he would be unable to meet his family's living expenses on this reduced draw compensation, in February 2009 Martin handed in his resignation, to take effect in July 2009 when his two-year contract was scheduled to expire. After accepting his resignation, Medical Associates gradually stopped giving Martin referrals and removed the staff and nurses assigned to him, before eventually reducing his draw to zero. This essentially forced Martin to leave the clinic in May 2009. Due to the contract's

competition clause forbidding him from practicing medicine within fifty miles of Clinton for two years, Martin and his family sold their home and left the city. He purchased tail malpractice insurance on his own in the amount of $52,782.

In August 2011, Medical Associates brought suit against Martin alleging breach of contract, unjust enrichment, and amounts due under an open account. The clinic alleged Martin had "with[drawn] funds in excess of the predetermined formula," in the amount of $108,445.75. Martin counterclaimed, alleging the clinic itself had breached its contract with Martin by miscalculating his production and erroneously reporting he had overdrawn his account. Martin sought general and consequential damages as a result of the clinic's alleged breach. After a bench trial in July 2013, the district court dismissed Medical Associates's claims and ruled for Martin. The court held Medical Associates breached the contract by failing to correctly calculate Martin's income according to the language in the contract and awarded damages to Martin.

The district court found several factors that demonstrated a contractual breach by Medical Associates. First, there was no dispute Holstein had erroneously deducted insurance costs from Martin's income, instead of adding it to his gross income as the contract required. James Dobbyn, the clinic's current CFO (Holstein had resigned shortly after Martin left), also confirmed Holstein had calculated Martin's compensation using a different ratio of RVU production and adjusted charges than the ratio stipulated in Martin's contract.[4] In addition, the

---

[4] While Martin's contract required his distribution of the clinic's net profits to be determined by a calculation of 50% RVU production and 50% professional adjusted charge production, in 2008 the clinic's membership changed the formula to 25% RVU

court noted the contract did not contain any language authorizing a fifty percent reduction of a physician's draw or the proper procedure for overdrawn associates to repay the clinic.

Furthermore, Alan Reusch, Martin's expert,[5] testified at trial that Holstein, when calculating Martin's distribution of the net profits, had erroneously compared only five months of Martin's RVU production to twelve months of production by the entire clinic. According to Reusch, the result reduced Martin's RVU production by half and, when coupled with the insurance payments wrongfully charged to Martin, caused Holstein to mistakenly believe Martin had overdrawn his account. Reusch's calculations further showed Martin had in fact been underpaid by the clinic. The court found Reusch's testimony convincing and "the most appropriate considering the plain language of the employment contract that applied to Dr. Martin." The court also found the clinic's removal of support staff from Martin's service and reducing Martin's salary to zero to be a breach of good faith and fair dealing. The court concluded that "Dr. Martin did not breach his employment agreement by withdrawing funds in excess of the predetermined formula, did not get unjust[ly] enriched and does not owe plaintiff on an open account." The court awarded Martin $13,819 for income owed him

production and 75% professional adjusted charge production. This new formula was used to determine Martin's income rather than the formula in his contract. The trial court noted the difference but did not attach great weight to its effect on the calculations: "While this factor may not be major in the overall calculations it is indicative of how Mr. Holstein did not follow the contract provisions as they pertained to Dr. Martin's written agreement as an associate physician."

[5] Reusch is a CPA (certified professional accountant)licensed to practice in Iowa and Illinois, with over twenty years of accounting experience involving medical and professional practices.

by the clinic based on Reusch's calculations, $15,111.90 in accounts receivables that had not been credited to him since his departure, $16,600 for "the delay in getting the home sold and the mortgage, insurance and real estate taxes paid during that period," and $52,782 for reimbursement of the tail insurance purchased by Martin. Medical Associates filed a timely notice of appeal challenging the sufficiency of the evidence in support of the court's verdict.

## II. SCOPE AND STANDARD OF REVIEW

This appeal is for a contract action tried at law. We review law cases of the district court for correction of errors at law. Iowa R. App. P. 6.907. Factual findings of the district court are binding if there is substantial evidence supporting the verdict. *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013). Evidence is considered substantial if a reasonable mind would accept it as adequate to reach the conclusion of the district court. *Smith v. State*, 845 N.W.2d 51, 54 (Iowa 2014). "'[T]he ultimate question is whether [the evidence] supports the finding actually made, not whether the evidence would support a different finding.'" *Fischer v. City of Sioux City*, 695 N.W.2d 31, 34 (Iowa 2005) (quoting *Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004)). This determination is made in the light most favorable to the district court's judgment. *Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 414, 418 (Iowa 2005).

## III. BREACH

Medical Associates alleges there is insufficient evidence to support the district court's holding that the clinic incorrectly applied the contract's formula and miscalculated Martin's compensation account. The clinic points to the language

under "gross professional fee revenue" in Policy Bulletin No. 6, which states that "regular accounting principles utilized by the membership" apply to its calculation. Medical Associates argues it follows from this language that "all calculations used in determining draws are based upon the accounting principles utilized by the membership," and therefore "[w]ithout an accounting standard or a relevant contract term establishing the proper method, Martin failed to establish Medical Associates miscalculated Martin's compensation."

In response, Martin contends error was not properly preserved on this issue because Medical Associates failed to raise any relevant objections or arguments at trial. However, as Medical Associates here is challenging the *sufficiency* of the evidence at trial rather than the *admissibility* of said evidence, error has been properly preserved for the sake of this appeal pursuant to rule 1.904(2) of the Iowa Rules of Civil Procedure.

To prove a breach of contract, a party must show:

(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Id.* Contract interpretation, that is the meaning of contractual language, is a legal issue for the court to decide unless the interpretation is dependent on extrinsic evidence. *Id.* "The cardinal rule of contract interpretation is to determine what the intent of the

parties was at the time they entered into the contract." *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). The words of the contract are "the most important evidence" in this determination. *Id.* "When there are ambiguities in the contract, they are strictly construed against the drafter." *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997).

At trial, Martin and Medical Associates sparred over the correct application of the compensation formula found in the employment contract. The contract clearly states compensation is calculated by applying a combination of a physician's RVU production and adjusted charges against the overall clinic's net professional income. However, it is silent as to whether the RVU production and charges should be compared against the clinic's numbers for the same time periods. At trial, Martin's expert demonstrated Medical Associates had compared five months of Martin's RVU production and adjusted charges against an entire year of the clinic's income. Martin contended this calculation was erroneous and a breach of the contract. Medical Associates denied its calculation was wrong or unfair to Martin.

Martin's expert, Alan Reusch, has been a CPA for over thirty years. He spends "sixty to seventy percent" of his time working with professional practices, primarily physicians, and is familiar with compensation procedures based on RVUs and adjusted professional charges. Reusch was provided with Medical Associates's records regarding Martin's compensation account. At trial he demonstrated in detail, using the clinic's own figures and documents, why the

clinic's calculations were incorrect and how they result in a misrepresentation of Martin's production and charges.[6]

Medical Associates argues its "accounting principles" control the income calculations in the contract and that Reusch's calculations are invalid because they are not based upon these principles. However, nowhere in the contract, the evidence at trial, or Medical Associates's brief is there an explanation of what "the accounting principles utilized by the membership" are. The record clearly establishes Reusch used the formula from the express terms of the contract and the numbers collected by the clinic, applied his longtime experience with accounting standards customarily utilized in medical practices, and determined Medical Associates had miscalculated Martin's draw.

Our standard in reviewing the record is to determine whether substantial evidence supports the verdict. *Smith*, 845 N.W.2d at 51. In other words, whether a reasonable mind would accept the evidence as adequate to support the verdict. *Id.* Even if we were to accept the clinic's reading that "all calculations used in determining draws are based upon the accounting principles utilized by the membership," it would not detract from the sufficiency of either Reusch's testimony or the overall evidence in support of the district court's

---

[6] Medical Associates was unable to explain with certainty the calculation methods used by its then-CFO, James Holstein, as he had been voted out by the clinic's membership shortly after Martin left and did not appear before the district court at trial. Holstein's replacement, James Dobbyn, speculated at trial that his predecessor had compared five months of Martin's production to the entire clinic's annual income because Martin's five months were from the latter half of the year, and traditionally the clinic's income in the back half of the year was greater than the front half. The record showed however that the actual income from the time period in question, 2008-2009, was the same in the last quarter of 2008 as the first quarter of 2009.

finding that Medical Associates breached its contract with Martin. We are convinced by the record here that substantial evidence supports the court finding a breach of contract by Medical Associates.

In addition to Reusch's testimony that the clinic erroneously compared five months of Martin's production to an entire year of the clinic's production, Medical Associates did not challenge Martin's assertion that it incorrectly deducted insurance costs from Martin's income, as the contract expressly states the costs are to be included as taxable income. Furthermore, neither did the clinic deny it had calculated Martin's draw using a different ratio of RVU production and adjusted charges than the ratio stipulated by the contract. Based on this record, we find the district court did not err in ruling that Medical Associates failed to correctly calculate Martin's income and unpaid accounts receivables according to the contract. Accordingly, we affirm the judgment for breach of contract and the award of general damages of $13,819, the amount Reusch calculated Martin was underpaid as a result of Medical Associates' miscalculations, and $15,111.90 in accounts receivables that had not been credited to him since his departure.

## IV. CONSEQUENTIAL DAMAGES

Medical Associates next contends there is insufficient evidence of causation to support the district court's award of consequential damages totaling $69,382. The clinic argues it should not have to reimburse Martin for expenses incurred by Martin while his home was on the market or the cost of tail insurance purchased by Martin after he left the clinic.

An injured party is "generally entitled to be placed in as good a position as he or she would have occupied had the contract been performed." *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998). Any damages awarded must relate to the nature and purpose of the contract itself. *Id.* Damages cannot be speculative:

> [D]amages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement. Whether the damages were reasonably anticipated by the parties when the contract was formed may be discerned from "the language of the contract in the light of the facts, including the nature and purpose of the contract and circumstances attending its execution."

*Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994) (citations omitted) (quoting 22 Am. Jur. 2d *Damages* § 460, at 541 (1988)). Damages may also be considered foreseeable if they arise from "the ordinary cause of events" or "as a result of special circumstances . . . that the party in breach had reason to know." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 847 (Iowa 2010) (quoting Restatement (Second) of Contracts § 351, at 135 (1981)).

In considering whether any award of consequential damages was appropriate, we must determine the nature of Martin's voluntary resignation from the clinic. Medical Associates contends Martin is not entitled to an award of consequential damages arising from his resignation because it was "voluntary." While this may be true in a technical sense, the record shows Martin would not have resigned from the clinic but for the breach of the contract by Medical Associates. Martin resigned only after learning his draw would be reduced by

fifty percent, a result of the clinic miscalculating his compensation. As Martin believed the adjusted draw would not provide him adequate compensation to meet the needs of his family, he decided to resign and seek other employment. Based on this record, we find his resignation was not "voluntary" but instead was "forced" by the clinic's breach of the contract. As a result, the circumstances of Martin's resignation do not preclude him from recovering consequential damages.

In order to compensate Martin for the expenses he incurred pending the sale of his home in Clinton, the district court awarded him damages for the mortgage, insurance, and real estate taxes he paid while waiting for the home to sell. Medical Associates alleges there is a lack of substantial evidence to find its breach of contract caused these damages. The clinic contends the miscalculation of Martin's draw is not sufficiently related to the sale of his house, and that such expenses were "neither foreseeable nor contemplated by the parties when the agreement was signed." Finally, Medical Associates argues there is no evidence Martin would have become a member of the clinic absent the breach, and thus "it cannot be assumed the sale of the house would not have occurred without the breach of contract."

The contract's no-compete clause forbade Martin from practicing medicine within fifty miles of the city of Clinton "[u]pon expiration of [the] Agreement or termination of [his] employment with Medical Associates." Because Martin's resignation was a direct result of the clinic's miscalculation of his draw, the consequence that he sell his home was caused by Medical Associates's breach

of the contract. The sale of his home was a reasonably foreseeable consequence of the clinic's breach, which effectively forced Martin out of the clinic. The no-compete clause was drafted by the clinic and is clearly expressed within the contract. The clinic had previously enforced similar clauses against former employees. In addition, there is no evidence to support a conclusion that Martin would not have bought into the membership of Medical Associates but for the clinic's breach of the contract. Thus, we find substantial evidence supporting the district court's holding that the sale of Martin's home was a reasonably foreseeable result of the breach by Medical Associates.

Medical Associates argues even if the breach had not occurred Martin would still be responsible for paying these costs as he would most likely still occupy the home. This argument is unpersuasive. Martin was incurring costs on an empty house, not a home he was occupying. And if Martin were still occupying the home in Clinton and working at Medical Associates, it follows he would have been receiving his salary from the clinic as well. As previously noted, in order for an injured party to recover, damages based on a breach of contract must have been foreseeable at the time the parties entered into the contract. *See Kuehl*, 521 N.W.2d at 718. Because the sale of Martin's home was a natural and foreseeable consequence of Medical Associates's breach, we affirm the district court's award of consequential damages for expenses incurred by Martin in the sale of his home.

Medical Associates further alleges the purchase of tail insurance by Martin is not a consequence of its breach. The clinic contends the contract expressly

requires Martin to reimburse it for tail insurance if he terminates his relationship with the clinic before the end of the two-year contract. Medical Associates argues Martin's decision to resign, rather than the clinic's breach, caused him to purchase tail insurance.

As we have already established that Martin's resignation was caused by the contractual breach by Medical Associates, it follows that Martin's purchase of tail insurance was a direct consequence of the breach. The tail insurance clause in the contract is clearly expressed, and it would have been readily apparent and contemplated by both parties when they entered into the contract. *See id.* The damages here were thus reasonably foreseeable. We therefore find substantial evidence supporting the district court's award for the cost of purchasing tail insurance.

## V.  CONCLUSION

The record shows substantial evidence that Medical Associates failed to correctly calculate Martin's income according to the terms of the contract. Accordingly, we affirm the district court's finding that the clinic breached its contract with Martin, and affirm the award of damages for unpaid compensation. Because certain expenses associated with the sale of Martin's home and his purchase of tail insurance were direct and reasonably foreseeable results of Medical Associates's breach, consequential damages for these expenses incurred by Martin should be awarded, and we find substantial evidence supports the findings by the district court.

**AFFIRMED.**