# IN THE SUPREME COURT OF IOWA

No. 22–0790

Submitted September 13, 2023—Filed October 27, 2023

**UE LOCAL 893/IUP,**

    Appellee/Cross-Appellant,

vs.

**STATE OF IOWA,**

    Appellant/Cross Appellee.

---

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.

An employer appeals a finding that it breached certain collective bargaining agreements and an award of damages to a union. The union cross-appeals the denial of its attorney fees claim. **AFFIRMED.**

May, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General; Jeffrey S. Thompson, Solicitor General; and Job Mukkada (argued), Tessa M. Register, and Emily Willits (until withdrawal), Assistant Attorneys General, for appellant/cross-appellee.

Charles Gribble (argued), Christopher Stewart, and Carly Scott (until withdrawal) of Gribble Boles Stewart & Witosky Law, Des Moines, for appellee/cross-appellant.

**MAY, Justice.**

A labor union sued an employer because the employer refused to collect dues from union members' paychecks. At summary judgment, the district court ruled that the employer's refusal to collect dues was a breach of certain collective bargaining contracts. After trial, the district court awarded money damages to the union. But the district court declined the union's request for attorney fees. Now the employer appeals and the union cross-appeals. Their appeals raise four questions:

1. Did the district court err by concluding that the employer breached the contracts?

2. Did the district court err by awarding money damages to the union?

3. Was there insufficient evidence to support the district court's conclusion that the union adequately mitigated damages?

4. Was the district court wrong to deny the union's request for attorney fees?

We answer all four questions in the negative. We affirm.

**I. Factual Background.**

**A. The Parties and Their History.** As mentioned, this case involves a dispute between a union and an employer. The union is UE Local 893/IUP, which we refer to as "UE." The employer is the State of Iowa.

The dispute involves two bargaining units. One unit is made up of science workers. The other unit is made up of social services workers. Both units are represented by UE.

For each of these units, UE and the State have entered a long series of collective bargaining contracts over the past few decades. More particularly, UE and the State have entered a new two-year agreement for each unit every two years. The last "noncontentious" contracts (so to speak) were in effect from

July 1, 2015, through June 30, 2017. We refer to them as the "2015–2017 contracts."

**B. UE and the State Negotiate for the 2017–2019 Contracts.** In May 2016, while the 2015–2017 contracts were still in effect, UE and the State agreed to a schedule for negotiating the next set of contracts. Like prior contracts, this next set of contracts would be effective for another two-year period. Specifically, they would be effective from July 1, 2017, through June 30, 2019. We refer to them as the "2017–2019 contracts."

On December 6, 2016, UE presented its initial offer for the 2017–2019 contracts to the State. On December 20, the State responded with its initial offer. Each side's offer requested a few new terms. But as to most issues, including the issue of dues collections, both the State and UE asked for the 2017–2019 contracts to contain the same terms as the 2015–2017 contracts.

On January 10, 2017, UE and the State met for a negotiating session. At this session, neither UE nor the State deviated from its initial offer. It appears that the State was waiting to see whether the legislative session would bring changes to Iowa's collective bargaining laws. UE and the State canceled the additional bargaining sessions scheduled for later in January.

Meanwhile, lawmakers were indeed considering collective bargaining. On February 9, House File 291 was introduced in the Iowa House of Representatives. *See generally* 2017 Iowa Acts ch. 2 (codified in scattered chapters of Iowa Code (2018)). Upon enactment, House File 291 would bring substantial changes to Iowa's public employee collective bargaining law. *See, e.g., id.* §§ 6, 22 (codified at Iowa Code § 20.9 (2018); *id.* § 70A.19). Important here, House File 291 would exclude dues checkoffs from the scope of negotiations. *Id.* § 6 (codified at Iowa Code § 20.9 (2018)). House File 291 would also prohibit the State from deducting dues from employees' paychecks. *Id.* § 22

(codified at Iowa Code § 70A.19 (2018)). But these prohibitions would not apply to collective bargaining agreements ratified before House File 291's effective date. *Id.* § 27.

House File 291 was signed by the Governor on February 17. And House File 291 took effect on February 17. *See id.* §§ 26, 48, 53, 64, 67. But before House File 291 was signed or could take effect, UE took action of its own. On February 10, UE sent a letter to the State. This letter explained that UE's negotiation committee had voted to accept the State's December 20 offer.

Then UE got its members involved. On February 14, UE's members voted unanimously to ratify the State's offer of December 20, 2016. The next day, UE notified the State of the ratification vote. But the State did not acknowledge that new contracts had been formed.

**C. UE Files the First Suit.** So then, on February 21, 2017, UE filed a petition against the State in district court. UE asked the court to declare that, indeed, new contracts for 2017–2019 had been formed and were enforceable.

**D. The State Still Performs the 2015–2017 Contracts.** Meanwhile, and despite the disagreement about the 2017–2019 contracts, the State continued to perform the 2015–2017 contracts. The State's performance included collecting dues from union members who had submitted authorizations. This collection of dues was required by the written terms of the 2015–2017 contracts. Here is a relevant excerpt:

> ARTICLE II
>
> RECOGNITION & UNION SECURITY
>
> . . . .
>
> SECTION 2 Dues and Fees Deductions

A. Upon receipt of a voluntary individual written request from any of its employees covered by this Agreement on forms provided by [UE], the [State] will deduct from the pay due such employee those dues required as the employee's membership dues in [UE], and fees for [UE-]sponsored credit union and insurance programs.

(Emphasis omitted.)

**E. Later, the State Stops Collecting Dues.** By their terms, the 2015–2017 contracts expired on June 30, 2017. And in June 2017, the State continued to dispute that any new 2017–2019 contracts had been formed. Also, it appears the State was worried that if new 2017–2019 contracts had *not* been formed, the State's continued collection of dues could be unlawful under House File 291. As of June 2017, though, no court had determined whether new 2017–2019 contracts had been formed. That is apparently why the State stopped collecting dues in June 2017.

**F. Judgment for UE in the First Suit.** A few months later, in November 2017, the district court ruled on pending summary judgment motions in the first suit. The court granted summary judgment in favor of UE and against the State. The court declared that the 2017–2019 contracts "accepted by [UE] and ratified by its members [are] valid and enforceable on the terms agreed to." And the court directed UE and the State "to perform as required under" the 2017–2019 contracts.

**G. The State Appeals and Seeks a Stay.** The district court's ruling was timely appealed by the State. The State also asked this court to stay the district court's ruling while the appeal proceeded. A justice of this court denied the State's motion. Then the State asked for three-justice review. A three-justice panel denied the State's request for a stay on February 22, 2018.

**H. The State's Performance of the 2017–2019 Contracts.** After the three-justice order was issued, the State began to implement some requirements

of the 2017–2019 agreements. The State did not, however, resume collecting dues.

As to the dues issue, the State explained its position in a letter to UE dated March 9, 2018. The March 9 letter advised UE that before the State would reinstate dues collection "on a go-forward basis," the State would need to receive "a current written authorization" from each employee. The letter also addressed "retroactive collection of dues" from "July 1, 2017[,] to date." The State offered to collect those dues if three conditions were met. First, the employees must sign new written authorizations. Second, UE must agree to "indemnif[y] . . . the State . . . for any and all claims, including but not limited to claims filed by individual employees, arising from the retroactive collection of dues." Finally, UE must "release[] the State from any claim [that] [UE] may assert related to the State not collecting dues between July 1, 2017[,] and the date dues deductions are reinstated."

**I. UE Responds to the State's Refusal to Collect Dues.** UE did not agree to the demands contained in the State's letter. Nor did UE otherwise try to obtain new dues deduction authorizations from its members. UE believed it was not obligated to do so.

But UE did make extensive efforts to obtain dues directly from its members. Those efforts included, among other things, working with third-party vendors to smooth the process. Through these efforts, UE collected over $350,000 from members.

**J. This Court Resolves the First Appeal in UE's Favor.** Meanwhile, the appeal in UE's first suit continued to progress. In May 2019, this court issued its opinion. *UE Loc. 893/IUP v. State*, 928 N.W.2d 51 (Iowa 2019). We concluded that the State's December 20, 2016 offer had not been withdrawn when UE's members voted to ratify its terms on February 14, 2017. *Id.* at 56–57, 69. And

so we affirmed the district court's ruling that enforceable 2017–2019 contracts were "formed upon the union's ratification vote." *Id.* at 68.

**K. UE Commences This Second Suit.** About two months later, in July 2019, UE commenced this second suit. UE alleged that the State breached the 2017–2019 contracts by refusing to deduct dues. The district court agreed and granted summary judgment in UE's favor "regarding the State's liability for breach of contract for failing to deduct dues." The case then proceeded to a bench trial on the issue of damages. As damages for the State's failure to deduct dues, the court awarded $1,046,835.05 to UE. The court calculated this number as the difference between the approximate amount of dues that UE lost because of the State's breach ($1,399,345.92) minus the amounts that UE recovered through its direct solicitation of dues from members ($352,510.87). The union also asked for attorney fees but the district court declined.

The State now appeals both the determination that the State breached the contracts and the award of money damages. UE cross-appeals the denial of its attorney fee claim.

**II. Merits.**

**A. The State's Duty to Collect Dues.**

1. *Analysis.* We first consider whether the district court erred by concluding at summary judgment that the State breached the 2017–2019 agreements by declining to collect dues from UE members who had submitted authorizations during prior contract periods. Our review is for correction of errors at law. *Livingood v. City of Des Moines*, 991 N.W.2d 733, 740 (Iowa 2023). The district court must grant summary judgment if the undisputed facts establish that a party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3).

The State argues that summary judgment was inappropriate because the State had no obligation to collect dues. There was no obligation, the State contends, because UE's members did not provide *new* dues authorization cards after the 2017–2019 contracts became effective. UE disagrees. UE believes that the State should have honored all dues authorization cards that the State had received, *regardless* of whether the cards were received before or during the 2017–2019 term. And so, UE contends, the State should have honored cards submitted during any prior contract term, i.e., during the 2015–2017 term, the 2013–2015 term, and so on.

To decide which view is correct, we must examine the terms of the 2017–2019 contracts. Because the 2017–2019 contracts were written contracts, our focus is on their written words. *Alta Vista Props., L.L.C. v. Mauer Vision Ctr., P.C.*, 855 N.W.2d 722, 727 (Iowa 2014). We strive to give a reasonable, lawful, and effective meaning to every word and every provision of the contracts. *U.S. Bank, Nat'l Ass'n v. Bittner*, 986 N.W.2d 840, 848 (Iowa 2023).

Before we can assign meaning to the contracts' words, though, we must identify what those words are. And that is not an entirely straightforward task here. The record contains no booklet, pamphlet, or other document entitled "2017–2019 contract" or something to that effect. Indeed, the parties agree that because of the way the negotiations went—and particularly the State's initial denial that 2017–2019 contracts had even been formed—the 2017–2019 contracts were never reduced to formal writings. Even so, the parties agree that the written terms of the 2017–2019 contracts can be readily identified from the record before us. Those terms can be identified for three reasons: (1) the record contains the 2015–2017 contracts, which were reduced to formal writings; (2) in its initial offer, the State offered to enter 2017–2019 contracts with the same relevant terms as the 2015–2017 contracts; and (3) UE accepted the State's

initial offer. In short, UE and the State agreed that the relevant terms of the 2017–2019 contracts should be *the same as* the terms of the 2015–2017 contracts. So we use those 2015–2017 contracts to find the relevant words of the 2017–2019 contracts.

Based on our analysis of those words, we conclude that the 2017–2019 contracts required the State to collect dues from all UE members who had submitted dues authorizations, including those members who submitted their authorizations in prior contract terms. This conclusion finds support in two portions of the contracts. First, as noted, Article II, Section 2 of the contracts dealt with dues collection. Within that section, we find paragraph II.2.A, which provided that "[u]pon receipt of a voluntary individual written request from" a union member, the State was obligated to collect that member's dues. This "upon receipt" language made it clear that the State would *not* be required to deduct dues from a member's paycheck *before* the State received an authorization. This only makes sense because, of course, unless and until a member authorizes a deduction from that member's wages, the State should make no deduction. At the same time, though, this "upon receipt" language plainly required the State to collect dues *after* the State received an authorization from a member. And, contrary to the State's argument, this language is not so limited that it only applies to members who submitted authorizations after the 2017–2019 contracts took effect at 12:00 a.m. on July 1, 2017. It is not so limited that it would permit the State to simply disregard authorizations received at 11:59 p.m. on June 30, 2017. Nor does it permit the State to disregard authorizations that the State received hours, days, or even years earlier. Rather, "upon receipt" is broad enough to include *all* authorizations that the State received *regardless of whether* they were received before or after the effective date of the 2017–2019 contracts.

Either way, if the State had received an authorization, the contractual obligation to collect dues was triggered.

This view finds added support in paragraph II.2.C. That paragraph states: "An employee's dues deductions shall be terminable according to the provisions of Section 70A.19, Code of Iowa." The parties agree that the applicable version of "Section 70A.19" is the version that preceded the House File 291 amendments. So we look for the meaning of this language in section 70A.19 of the 2015 Code. That Code section imposed limits on when and how State employees could terminate their dues checkoff authorizations. Iowa Code § 70A.19 (2015). Authorizations could not be terminated unless two requirements were fulfilled. *Id.* First, termination could not occur until a year had passed "or until the expiration of the collective bargaining agreement, whichever occurs first." *Id.* Second—and additionally—termination could not occur unless and until the employee had given "thirty days' written notice of termination." *Id.* Unless both of these conditions were met, a dues authorization could not terminate. *Id.*

These conditions support UE's view that authorizations signed in prior contract terms generally remain effective in future terms. Neither the mere passage of time nor "the expiration of [a] collective bargaining agreement" is sufficient to terminate an authorization. Rather, unless an employee has given "written notice of termination," that employee's authorization cannot terminate. *Id.* And, in this case, no one claims that any affected employees provided written notices of termination. This means that no employees' authorizations could have terminated. Those authorizations were all still effective during the 2017–2019 contract term. And so, during the 2017–2019 contract term, the State was still obligated to collect dues.

In short, we think the contracts' written terms make it clear that the State breached by failing to collect dues during the 2017–2019 term. The parties'

course of dealing supports the same conclusion. *See, e.g., BLET GCA UP v. Union Pac. R.R.*, 988 F.3d 409, 413–14 (7th Cir. 2021) (stating "any well[-]established practices that constitute a 'course of dealing' between the" employer and employees "form part of the agreement the same as do any specific terms set out in the text of the agreement." (quoting *Ry. Lab. Execs. v. Norfolk & W. Ry.*, 833 F.2d 700, 705 (7th Cir. 1987))); *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1102 (9th Cir. 1999) (stating that a multidecade course of dealing creates a contractual expectation); *Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 137 (3d Cir. 1993) (holding that "past dealings" of employer and union "over a substantial time period" "are probative of the parties' intent"). The parties agree that throughout their long history of bargaining for the science and social services units, the State has never before taken the position that union members have to present new authorization cards at the start of each new two-year contract period. Rather, the State has always honored authorization cards entered in prior contract terms. This supports UE's view that the parties had indeed agreed that dues authorizations would be durable from contract term to contract term. So no new authorizations were required at the beginning of the 2017–2019 term.

2. *Counterarguments.* We have considered all of the State's counterarguments. Three of them warrant additional discussion. First, we note that at oral argument, the State repeatedly suggested that we may not consider extrinsic evidence, such as the parties' course of dealing, because the written contracts are not ambiguous. That is not quite what our recent cases have said about extrinsic evidence. *See, e.g., U.S. Bank*, 986 N.W.2d at 848 ("Put another way, no determination of meaning or ambiguity should be made by the trial court without first considering: (1) the contract as a whole, and (2) any extrinsic evidence offered by the parties as to the contract's meaning. At this point, if the

meaning of a contract term is unambiguous, parol evidence may not be presented to the fact finder to contradict that term under the facade of interpreting it."). But this case does not require us to further explore the extrinsic-evidence issue. Even if, as the State suggests, we disregard the parties' course of dealing, the meaning of their contracts is still clear. Even if, as the State asks, we look only at the written terms, it is still clear that the State was required to collect dues during the 2017–2019 term.

Second, we note the State's argument that no Iowa statute "requir[ed] dues checkoff elections to be carried over from contract term to contract term." The State concedes, though, that before House File 291 became effective, UE and the State were statutorily authorized to bargain over dues collection. And for the reasons already explained, we believe the parties bargained for dues authorization cards to remain effective from one contract term to the next.

Third, we note the State's point that its contracts with UE did not contain "survival clause[s]." Indeed, as the State notes, each contract provided that "[u]pon termination of the Agreement, all obligations under the Agreement are automatically canceled." *Id.* But we do not believe this addresses the specific question before us. The question here is not whether *contracts* remained in effect after *their* expiration dates. Certainly, they did not. Rather, the question is whether *authorizations* submitted during one contract term could trigger obligations under later contracts. For the reasons already explained, we believe they could.

3. *Conclusion.* The undisputed facts show that the State breached the 2017–2019 contracts by failing to collect dues. The district court correctly granted summary judgment on this issue. We affirm this ruling.

**B. Award of Money Damages.**

1. *Analysis.* We next consider the State's argument that even if it breached the 2017–2019 contracts, the district court awarded the wrong remedy. A money damages remedy was inappropriate, the State contends. Instead, the State says, the only correct remedy was a form of specific performance, namely, an order that the State retroactively collect dues from union members.

The State's remedy argument presents a legal issue, which we review for correction of errors at law. *Westco Agronomy Co. v. Wollesen*, 909 N.W.2d 212, 219 (Iowa 2017). Following our review, we find no legal error. Instead, we believe an award of damages was correct for at least two reasons.

First, as a general matter, "[e]very breach of contract gives the injured party a right to damages against the party in breach." Restatement (Second) of Conts. § 346 cmt. *a*, at 110 (Am. L. Inst. 1981) [hereinafter Restatement (Second)]. In particular, "when a contract has been breached the nonbreaching party is generally entitled to" damages that will place that party "in as good a position as he or she would have occupied had the contract been performed." *Midland Mut. Life Ins. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998). This is sometimes called " 'benefit of the bargain' damages." *Id.* Here, the parties' "bargain"—their contracts—required the State to collect dues from UE's members and then forward those collected dues to UE. So the "benefit" that UE lost was the amount of money that UE would have received if the State had performed its dues-collection duty. That lost money was an appropriate remedy for the State's breach.

Second, we have found no authority for the proposition that a plaintiff can only obtain specific performance when, as here, money damages are adequate and preferred by the plaintiff. Indeed, when "damages would be adequate to protect the expectation interest of the injured party," equitable remedies like

specific performance are usually "preclud[ed]." *Homeland Energy Sols., L.L.C. v. Retterath,* 938 N.W.2d 664, 694 (Iowa 2020) (quoting Restatement (Second) § 359(1), at 169). That is the case here: damages are an adequate remedy for UE and, therefore, specific performance is unavailable. *See Breitbach v. Christenson,* 541 N.W.2d 840, 843 (Iowa 1995) (en banc) (noting that specific performance "is to be granted only in extraordinary, unusual cases in which irreparable harm will result in its absence, not as a matter of grace").

2. *Counterarguments.* We have considered all of the State's counterarguments. Six of them deserve additional discussion. First, we have considered the State's argument that an award of damages was not within the contracting parties' contemplation. And, certainly, we agree that courts "must scrutinize the terms of the contract to determine whether the damages were within the contemplation of the parties." *Royal Indem. Co. v. Factory Mut. Ins.,* 786 N.W.2d 839, 847 (Iowa 2010). Unlike the State, though, we do not think this means that damages cannot be awarded unless the contract *expressly* addresses damages. Rather, it just means that "damages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement." *Id.* (quoting *Kuehl v. Freeman Bros. Agency,* 521 N.W.2d 714, 718 (Iowa 1994)). To decide what damages were foreseeable or contemplated, we consider "the language of the contract in the light of the facts, including the nature and purpose of the contract and circumstances attending its execution." *Id.* (quoting *Kuehl,* 521 N.W.2d at 718). We use those considerations to decide what damages "a reasonable person would expect to follow from breach of a contract." *Id.* (quoting *Kuehl,* 521 N.W.2d at 718). Damages of that sort "are direct and thus should be awarded." *Id.* (quoting *Kuehl,* 521 N.W.2d at 718).

Applying these principles here, we believe the district court did not err by awarding damages based on the dues that the State refused to collect. After all, the contracts plainly required the State to collect dues for UE. A reasonable person would have expected that if the State breached this obligation, UE would lose the money that the State was supposed to have collected. This loss was well within the contemplation of the contracting parties.

Second, we have considered the State's reliance on an indemnification clause in the contracts. This clause stated: "The Union shall indemnify and save the Employer harmless against any and all claims, demands, suits, or other forms of liability which may arise out of any action taken or not taken by the Employer for the purpose of complying with the provisions of [Section 2]." According to the State, this clause precludes an award of damages against the State. But the State does not cite, and we have not found, cases in which we have interpreted similar clauses to preclude—or to limit the remedies available in—breach of contract suits among *the parties to a contract*. Instead, we have read these clauses to "evidence the parties' intent to protect a party from claims brought *by third parties*." *Homeland Energy Sols., L.L.C.*, 938 N.W.2d at 708 (emphasis added). So, for example, if a union *member*—who is not a party to the contract—were to sue the State for withholding dues from the member's paycheck, the defense-and-indemnity clause could require the union to protect the State against the *member*'s claims. The clause would not, however, prohibit *the union* from enforcing the contract through a suit for damages against the State. *See Est. of Pearson v. Interstate Power & Light Co.*, 700 N.W.2d 333, 344–45 (Iowa 2005).

Third, we have considered the State's argument that the essence of the agreement doctrine precludes a damage award against the State. This is so, the State argues, because "the essence" of the dues-collection requirement was to

obtain money from union members, not from the State. This argument misses the mark. The essence of the agreement doctrine is a deferential standard that courts apply when reviewing labor arbitration decisions. *Cedar Rapids Ass'n of Firefighters, Loc. 11 v. City of Cedar Rapids*, 574 N.W.2d 313, 316–17 (Iowa 1998); *Sergeant Bluff–Luton Cmty. Ed. Ass'n v. Sergeant Bluff–Luton Cmty. Sch. Dist.*, 282 N.W.2d 144, 150 (Iowa 1979); *see also United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85 (1960). It does not limit judicial authority to enforce a collective bargaining agreement when, as here, there is no arbitration award.

Fourth, we have considered the State's point that even under traditional contract principles, "the measure of damages recoverable for a breach of contract in each case must have relation to the nature and purpose of the contract itself, as viewed in connection with the character and extent of the injury." *Midland Mut. Life Ins.*, 579 N.W.2d at 831 (quoting 22 Am. Jur. 2d *Damages* § 44 (1988)). And "the nature and purpose" of the contracts, the State contends, was to assist UE members in paying dues. The contracts "never contemplated that the State itself would pay the dues," says the State. And we agree that if the State had honored its obligations under the contracts by collecting dues from members, then the State could have simply passed those dues along to UE, all without becoming liable for money damages. But the State chose not to honor the contracts. Instead, it chose to breach them. And so it is appropriate for the State—like any other contracting party—to pay the damages caused by its breach. Courts have often awarded money damages against employers who have breached their contractual obligation to collect union dues. *E.g., Agathos v. Starlite Motel*, 977 F.2d 1500, 1510 (3d Cir. 1992); *Host Int'l, Inc. v. Unite Here Loc. 11*, No. LA CV19–01568, 2019 WL 13092933, at *5–6 (C.D. Cal. 2019); *Sheet Metal Workers Int'l Ass'n, Loc. Union No. 162 v. Jason Mfg., Inc.*, 694 F. Supp.

1476, 1477 (E.D. Cal. 1987); *Amalgamated Meat Cutters & Allied Workers of N. Am., Loc. No. 593 v. Shen–Mar Food Prods., Inc.*, 405 F. Supp. 1122, 1125 (W.D. Va. 1975).

Fifth, we have considered the State's argument that Iowa Code chapter 20 precludes an order of damages. The State focuses on section 20.17(5), which provides: "Terms of any collective bargaining agreement may be *enforced* by a civil action in the district court. . . ." Iowa Code § 20.17(5) (emphasis added). According to the State, the word "enforced" is crucial. A contract can only be enforced, the State contends, by obtaining equitable remedies like specific performance. And so, in the State's view, suits for damages are not authorized by section 20.17(5).

In evaluating the State's argument, we are guided by established principles of statutory interpretation. We look for the meaning of a statute in its text, the words chosen by the legislature. *Story Cnty. Wind, L.L.C. v. Story Cnty. Bd. of Rev.*, 990 N.W.2d 282, 285–86 (Iowa 2023). But our focus on the text does not mean that we engage in "[s]trict constructionism." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012) [hereinafter Scalia & Garner, *Reading Law*]. We do not impose "strict or crabbed" interpretations on the legislature's words. *Vroegh v. Iowa Dep't of Corr.*, 972 N.W.2d 686, 702 (Iowa 2022) (quoting Scalia & Garner, *Reading Law* at 233). We do not restrict those words to their most literal meanings. *See* Scalia & Garner, *Reading Law* at 356. Instead, we give those words their "fair and ordinary" meanings in light of the relevant context. *Com. Bank v. McGowen,* 956 N.W.2d 128, 133 (Iowa 2021).

With those principles in mind, we consider the word "enforced" in the context of section 20.17(5). And we acknowledge at the outset that—in a strictly literal sense—"enforcing" a contract means "seeking specific performance."

Bryan A. Garner, *Garner's Dictionary of Legal Usage* 317 (3d ed. 2011). This literal sense is noted by Bryan A. Garner in his legal usage treatise. *Id.* But in the same treatise—the same sentence—Garner acknowledges that "[l]awyers continually speak of enforcing contracts," even when specific performance is not sought. *Id.* (emphasis omitted). That sort of enforcement is expressly recognized in the latest edition of *Black's Law Dictionary*. It defines the verb "enforce" to include "[l]oosely, to compel a person to pay damages for not complying with (a contract)." *Enforce, Black's Law Dictionary* 668 (11th ed. 2019). We believe that definition is consistent with ordinary usage in the context of contract litigation. And so it is also consistent with the fair and ordinary meaning of "enforced" in the context of section 20.17(5), a statute that authorizes contract litigation. Iowa Code § 20.17(5). So we do not conclude that section 20.17(5) precludes suits for damages. Rather, we think it authorizes damage suits and, therefore, damage awards.

Finally, we have considered the State's contention that the doctrine of sovereign immunity precludes an award of damages. The State acknowledges, though, that sovereign immunity can be waived. And, like the district court, we think the State waived immunity in two ways. First, the State waived immunity by failing to plead it as an affirmative defense. Second, even if immunity had been properly pleaded, we would still find that it had been waived through the entry of the collective bargaining contract. *Kersten Co. v. Dep't of Soc. Servs.*, 207 N.W.2d 117, 119, 122 (Iowa 1973) (en banc); *see also AFSCME/Iowa Council 61 v. State*, 484 N.W.2d 390, 395 (Iowa 1992) (en banc) (holding "the State is liable on its contracts" entered into pursuant to chapter 20).

3. *Conclusion.* Our law authorized the district court's award of money damages. The court did not err in that award.

**C. Mitigation of Damages.** The State also claims that "[t]he trial court's determination that UE adequately mitigated its damages is not supported by the substantial evidence." This is true, the State argues, because UE declined the State's March 2018 request to obtain and submit new dues authorizations.

In analyzing this argument, we start with the well-known rule that "[a] person asserting breach of contract has a duty to mitigate the damages." *Kuehl,* 521 N.W.2d at 719. This means that the nonbreaching party must take reasonable measures "to lessen the damages caused by the other party's breach." *Id.* This duty is "one of 'reasonable diligence.' " *R.E.T. Corp. v. Frank Paxton Co.,* 329 N.W.2d 416, 422 (Iowa 1983). But the burden of pleading and proving inadequate mitigation is on "the asserting party," the party who breached. *Id.*

Here, the district court found that UE's efforts to mitigate were reasonable under the circumstances. This finding has "the force of a special verdict" and is "binding on us if supported by substantial evidence." *Id.* at 419. "We view the evidence in the light most consistent with the judgment." *Id.*

Following our review, we conclude substantial evidence supported the court's finding. The district court found—and the State does not dispute—that UE collected dues directly from its members "via cash, check, credit card, and checking/savings accounts to recover as much of its lost dues as possible." UE also worked with third-party vendors like UnionTrack to assist its efforts. All told, UE collected over $350,000 in net dues from its members. The district court implicitly concluded that these efforts were reasonably sufficient on their own. Viewing the record in the light most favorable to the judgment, we find adequate support for this conclusion. We affirm on this issue.

**D. Cross-Appeal on Attorney Fees.** Finally, we consider UE's cross-appeal. UE contends that the district court should not have denied UE's request for common law attorney fees. Because "[t]he determination of a common law

attorney fee award rests in the court's equitable powers[,] . . . our review of this issue is de novo." *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines*, 510 N.W.2d 153, 158 (Iowa 1993) (citation omitted). Following our de novo review, we conclude that the district court correctly denied UE's claim for attorney fees.

Claims for attorney fees are governed by the American rule. *Goche v. WMG, L.C.*, 970 N.W.2d 860, 863 (Iowa 2022). This means that attorney fee obligations usually aren't shifted from one party to the other. *Id.* Rather, parties usually pay their own attorney fees. *Id.*

We say "usually" because there are some limited exceptions. *See id.* at 863–65. The main exception is that attorney fees can be shifted if "clear and unequivocal language" in a statute or contract requires shifting. *Id.* at 864. But UE does not claim that any statute or contract requires shifting.

There is another exception for common law attorney fees. *See Hockenberg Equip. Co.*, 510 N.W.2d at 158–60. We have properly described this exception as "rare." *Id.* at 158. Common law attorney fees can only be awarded against a party whose behavior is extraordinarily culpable. *Id.* at 158–60. "The culpability of the . . . conduct" must "exceed" the kind of willful and wanton disregard that permits an award of punitive damages. *Id.* at 159–60. Indeed, the "conduct must rise to the level of oppression or connivance to harass or injure another." *Id.* "These terms," we have said, "envision conduct that is intentional and likely to be aggravated by cruel and tyrannical motives." *Id.* at 159.

Nothing approaching this level of culpability appears in the record before us. There was no basis for the district court to award attorney fees.

We acknowledge UE's argument that the State engaged in bad faith because it failed to perform when it knew that it was obligated to perform. We reject this argument on both factual and legal grounds. On the factual side, we

adopt the district court's finding that there were legitimate issues for the State to litigate and, therefore, the State's behavior did not amount to bad faith. On the legal side, we decline UE's invitation to adopt a federal standard under which bad faith conduct alone could justify a fee award. *Food Handlers Loc. 425 v. Valmac Indus., Inc.*, 528 F.2d 217, 219 (8th Cir. 1975) (per curiam) (discussing *Alyeska Pipe Line Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)). We have made it clear that "[m]ore than mere bad faith is required" to obtain fees under Iowa law. *Thornton v. Am. Interstate Ins.*, 897 N.W.2d 445, 475 (Iowa 2017). We do not change course now.

The district court was correct to deny fees. We affirm this ruling.

### III. Conclusion.

The district court was correct in finding the State liable, awarding money damages, finding that UE adequately mitigated damages, and refusing an award of attorney fees. We affirm on both appeal and cross-appeal.

**AFFIRMED.**